IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 14-cv-01968-MSK

OLOYEA D. WALLIN, a.k.a. DONALD OLOYEA WALLIN, a.k.a. OLOYEA WALLIN,

     Applicant,

v.

MICHAEL MILLER, Warden of Crowley County Correctional Facility, and
JOHN SUTHERS, The Attorney General of the State of Colorado,

     Respondents.

---

**OPINION AND ORDER DENYING APPLICATION FOR
WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

---

     This matter is before the Court on three claims remanded to this Court for further review. The United States Court of Appeals for the Tenth Circuit reversed "the application of procedural default to the habeas claims involving (1) use of the victim's confidential medical information, (2) use of the victim's involuntary statements, [and] (3) abuse of subpoena power." *See Wallin v. Miller, et al.*, No. 15-1301, 8-9 (10th Cir. Aug. 18, 2016). The Tenth Circuit determined that the Colorado Court of Appeals (CCA) had declined to consider these claims because they had already been rejected in earlier proceedings and not because Applicant had failed to present the claims. *Id.* at 8. The Tenth Circuit concluded that the CCA's rationale did not preclude a federal court from considering the claims. *Id.*

     Pursuant to this Court's Order on Remand, Respondents filed an Answer, on November 16, 2016, addressing the merits of the three remanded claims, and Applicant filed a Reply to Answer on January 13, 2017. After reviewing the Application, ECF No. 1, the November 16, 2016

Answer, ECF No. 57, the January 13, 2017 Reply, ECF No. 61,and the state court record, ECF No. 40, the Court FINDS and CONCLUDES that the three claims should be denied and the case dismissed with prejudice.

## I. BACKGROUND

The Court first revisits the factual background set forth in the July 21, 2015 Opinion and Order Denying Application in this case. ECF No. 42.

Applicant is challenging the validity of his conviction and sentence in Arapahoe County District Court case number 03CR2296. The factual background of Applicant's crimes and convictions is summarized in the [CCA's] opinion addressing his direct appeal as follows:

When defendant was released on parole in July 2003, I.M., his ex-wife picked him up from prison and drove him to her apartment. Defendant was upset because I.M. had given birth to another man's child while he was in prison. As I.M. reported events to the police, defendant took sixty dollars from her purse; beat her in the face and body with his fists, fracturing a bone next to her eye; and then left the apartment, driving off in her car.

The same day, defendant met with his parole officer and mentioned that he might have to take legal action against a girlfriend who was saying bad things about him. A few minutes after defendant left the parole officer, the police contacted the parole officer about the incident at the apartment. Within the next couple of days, the parole officer directed defendant to go to the police department and speak with a particular police officer. However, defendant did not go to the police department, but rather left a taped telephone message for the police officer. Defendant was later arrested at his home.

Defendant was charged by information with second degree assault, pursuant to § 18-3-203(1)(g), C.R.S. 2006; first degree aggravated motor vehicle theft, pursuant to § 18-4-409(2), C.R.S. 2006; theft, pursuant to § 18-4-401, C.R.S. 2006; and, ultimately, a crime of violence, pursuant to § 18-1.3-406(2)(a)(I)(B), C.R.S. 2006. A parole revocation complaint was filed effective the same day, and later, defendant's parole was revoked.

Soon after the charges were filed in this case, I.M. recanted all her allegations and filed a declaration with the court, stating that

2

defendant did not hit her or steal her money or her car, that she was on morphine for a head injury when police officers spoke to her at the hospital, and that they "coerced" her to blame defendant for her injuries. The prosecution endorsed an expert witness to testify at trial about domestic violence.

Defendant moved to suppress his taped message to the police as involuntary and to exclude the testimony of the prosecution's designated expert witness on domestic violence as irrelevant and unfairly prejudicial. The trial court denied both motions.

I.M. did not appear for defendant's trial, and a warrant issued for her. She was arrested and jailed overnight, and then she testified that defendant had assaulted her, but did not steal money from her purse or steal her car. The prosecution's expert witness testified generally concerning why victims of domestic violence recant at trial.

The People dismissed the theft charge, and the jury found defendant guilty of second degree assault and not guilty of motor vehicle theft.

At defendant's request, his trial counsel moved to withdraw before sentencing. The trial court declined defendant's request to appoint alternate defense counsel, and defendant appeared pro se at the sentencing hearing. The court sentenced him to fourteen years in the Department of Corrections.

*People v. Wallin*, No. 04CA1011, 1-3 (Colo. App. July 12, 2007).

The judgment of conviction was affirmed on direct appeal but remanded for resentencing, *id.*, at 17-18, which Applicant subsequently appealed, but dismissed, and then finally proceeded with a motion to recuse and a Colo. R. Crim. P. 35(c) motion. The recusal and Rule 35(c) motions were denied, Applicant appealed the denial, and the CCA denied the motions on appeal. *People v. Wallin*, No. 11CA0972 (Colo. App. Dec. 6, 2012). The CCA denied the motion to recuse for failure to demonstrate bias and the Rule 35(c) motion as successive. *Id.* The Colorado Supreme Court [(CSC)] denied Applicant's petition for writ of certiorari on June 16, 2014, in the collateral proceedings. *See People v. Wallin*, 2013SC739 (Colo. June 16, 2014). This Application was filed on July 15, 2014.

ECF No. 42 at 1-3.

## II.  STANDARDS OF REVIEW

### A.  *Pro Se* Standard

Applicant is proceeding *pro se.*   The Court, therefore, reviews the Application liberally and holds the pleading "to a less stringent standard than those drafted by attorneys."  *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).   However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).   A court may not assume that an applicant can prove facts that have not been alleged, or that a respondent has violated laws in ways that an applicant has not alleged.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).   An applicant's *pro se* status does not entitle him to an application of different rules.  *See Montoya v. Chao*, 296 F.3d 952, 958 (10th Cir. 2002).

### B.  28 U.S.C. § 2254

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   Applicant bears the burden of proof under § 2254(d).  *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

A claim may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). In particular, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* (collecting cases). Thus, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. "Where there has been one reasoned state judgment rejecting a federal claim," federal habeas courts should presume that "later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*. 562 U.S. at 98. In other words, the Court "owe[s] deference to the state court's *result*, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [me] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178. "This 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id.*

The Court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold

question a court must answer under § 2254(d)(1) is whether Applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008). If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1). *See id.* at 1018.

If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law. *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405*,* 120 S. Ct. 1495) (citation omitted0. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405, 120 S. Ct. 1495 (citation omitted).
>
> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08, 120 S. Ct. 1495 . . . .

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. The Supreme Court has also stated:

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Richter*, 562 U.S. at 101 (internal quotation marks omitted). In conducting this analysis, the Court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also Richter*, 562 U.S. at 102 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a
> state prisoner must show that the state court's ruling on the claim
> being presented in federal court was so lacking in justification that
> there was an error well understood and comprehended in existing
> law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The Court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows a court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court. Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Applicant bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' " *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, the Court's analysis is not complete "[e]ven if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006). "Unless the error is a structural defect in the trial that defies harmless-error analysis, [I] must apply the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . ." *Id.*; *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (providing that a federal court must conduct harmless error analysis under *Brecht* anytime it finds constitutional error in a state court proceeding regardless of whether the state court found error or conducted harmless error review). Under *Brecht*, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637. "[A] 'substantial and injurious effect' exists when the court finds itself in 'grave

doubt' about the effect of the error on the jury's verdict." *Bland*, 459 F.3d at 1009 (citing *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). "Grave doubt" exists when "the matter is so evenly balanced that [the Court is] in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435.

The Court makes this harmless error determination based upon a thorough review of the state court record. *See Herrera v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000). "In sum, a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Davis v. Ayala*, --- U.S. ---, 135 S. Ct. 2187, 2199 (2015) (citing *Fry*, 551 U.S. at 119-120).

If a claim, however, was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim de novo and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

### III.   MERITS OF THE CLAIMS

Applicant first presented Claims Four, Ten, and Eleven in a motion for new trial on March 18, 2010. *See* Case No. 03CR2296 Court File at 563-65. Applicant filed several motions to set a hearing date regarding the new trial motion over the course of eight months. *Id.* at 560-61, 651, 665. During this time the trial court refrained from ruling on the motion or setting hearings, because Applicant had an appeal pending and the trial court lacked jurisdiction. *See id.* at 650. The State finally filed a response to the motion on November 3, 2010, that asserted Applicant did not state a violation of state or constitutional law and he could not assert the rights of the victim regarding her medical privileges. *Id.* at 675-76. Subsequent to the State's response, Applicant filed a Colo. R. Crim. P. 35(c) postconviction motion, on November 10, 2010, in which he asserts a violation of his constitutional rights based on the admission of the victim's involuntary

statements and her consent to release her medical records, and an abuse of subpoena powers over the victim. *Id.* at 684-875. The trial court denied the motion for new trial on December 9, 2010, because Applicant had confused his rights afforded under the Constitution as a defendant with the rights of a victim. *Id.* at 893-894. The trial court then in a subsequent order acknowledged the November 10, 2010 Rule 35(c) postconviction motion and summarily denied the motion because no new arguments were raised in the Rule 35(c) motion. *Id.* at 911. When Applicant asked the trial court for a finding of facts and conclusions of law regarding the denial of the Rule 35(c) motion, *see id.* at 912-13, the trial court again summarily denied the motion for lack of a new argument, *see id.* at 920.

In addressing Applicant's Colo. R. Crim. P. 35(c) on appeal, the CCA found Claims Four, Ten, and Eleven were previously rejected by the trial court in Applicant's motion for a new trial and, therefore, were successive in Applicant's subsequent Rule 35(c) postconviction motion. *People of the State of Colo. v. Wallin*, No. 11CA0972, 11 (Colo. App. Dec. 6, 2012); ECF No. 1 at 55. The CCA found that the trial court had determined these claims were without merit because they were premised on the rights of a third party rather than Applicant's own constitutional rights. *Id.*

In the Rule 35(c) motion, Applicant, however, asserted that the violation of the victim's right to "medical confidentiality and privacy," and to be free from making involuntary statements and an illegal subpoena resulted in inadmissible evidence being presented to render Applicant's guilty verdict. Case No. 03CR2296 Court File at 563-64. To the extent the three claims assert a violation of Applicant's due process rights due to inadmissible evidence being presented to the jury, the claims were not addressed on the merits by either the trial court or on appeal by the CCA. A review of these claims, therefore, is subject to *de novo* review and the deferential standards of

§ 2254(d) do not apply.  *See Gipson*, 376 F.3d at 1196.  The Court, therefore, will proceed to the merits of Claims Four, Ten, and Eleven and deny the claims for the reasons stated below.

## A.  Claim Four/Admission of the Victim's Involuntary Statements

In Claim Four, Applicant asserts that the trial court erred by admitting the involuntary statements of the victim, which created a fundamental violation of his Fourteenth Amendment due process rights.  ECF No. 1 at 10.  Applicant contends that the involuntary statements made by the victim were unfairly prejudicial and had substantial and injurious effect and influence on the trial proceedings.  *Id.*  Applicant further contends there was no evidence that the victim's statement was being used as "a legal statement for recantation purposes."  *Id.*

In *United States v.* Gonzales, 164 F.3d 1285, 1289 (10th Cir. 1999), the Tenth Circuit found as follows:

> As an initial matter, we must decide whether it was proper to allow defendants to challenge the voluntariness of the subject witness' statements . . . . Obviously, defendants cannot seek to vindicate any violations of the subject witness' Fifth Amendment rights.  *See Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir.1997).  Instead, defendants must point to violations of their own constitutional rights.  *Id.*  Although defendants' rights were in no way affected by Lewis and Ainsworth obtaining the subject witness' statements, *see Buckley v. Fitzsimmons*, 20 F.3d 789, 794–95 (7th Cir.1994) ("Overbearing tactics violate the right of the person being interrogated to be free from coercion."), subsequent use of those statements could potentially implicate defendants' due process rights.  *See Clanton*, 129 F.3d at 1158.  More specifically, defendants' due process rights would be implicated if the subject witness was coerced into making false statements and those statements were admitted against defendants at trial.  *Id.*

> Whether a statement is voluntary is a question of law subject to de novo review, although specific underlying findings of fact are reviewed for clear error. A statement "is involuntary if the government's conduct cause[d] the [witness'] will to be overborne and '[her] capacity for self-determination critically impaired.' " *United States v. McCullah*, 76 F.3d 1087, 1100 (10th Cir.1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S. Ct. 2041, 36 L. Ed.2d 854 (1973)), *cert. denied* 520 U.S. 1213, 117 S. Ct. 1699 , 137 L. Ed.2d 825 (1997).  In determining whether a statement was freely and voluntarily given, the courts consider the totality of the circumstances.  *Arizona v. Fulminante*, 499 U.S. 279, 285–86, 111 S. Ct. 1246, 113 L. Ed.2d 302 (1991).  The relevant circumstances

embrace "both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226, 93 S. Ct. 2041; *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir.1998). Relevant factors include the suspect's age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether *Miranda* warnings were given, the accused's physical and mental characteristics, the location of the interrogation, and the conduct of the police officers.[1] *Lucero*, 133 F.3d at 1311.

> [1] We reject the government's argument that a non-defendant witness' statement that incriminates a defendant is subject to suppression only if the statement was the product of torture or extreme coercion beyond the level of coercion required for suppression of a defendant's own confession. As we noted in *Clanton*, "methods offensive when used against an accused do not magically become any less so when exerted against a witness." 129 F.3d at 1158. Consequently, the standard for determining whether a statement was voluntary is the same whether we are dealing with a defendant or a third-party witness.

*Gonzales*, 164 F.3d at 1289.[1]

First, the Court notes that the victim testified at Applicant's preliminary hearing on August 25, 2003. Aug. 25, 2003 Prelim. Hr'g at 14-29. At this time, she testified that (1) she did not remember what happened and all she knew was that she was at the hospital after she had called her mom, who apparently called the police and an ambulance; (2) she was on morphine for the pain and did not remember the answers she may have given to officers while at the hospital; and (3) she remembered signing a medical release form. *Id.*

The Court further notes that after the preliminary hearing, on November 24, 2003, the victim signed a declaration (referred to as an affidavit by the trial court) that stated she told officers, while she was at the hospital, she did not want to talk to them and she involuntarily agreed to their statements due to harassment, her pain, and her desire to be left alone. Case No. 03CR2296 Court File at 65. The victim further declared that she

---

1 In *Clanton* the government actor violated the plaintiff's clearly established due process rights under the Fourteenth Amendment by obtaining a third party's involuntary confession and then using the involuntary confession to arrest and imprison the plaintiff. *Clanton*, 129 F.2d at 1152, 1159. The Tenth Circuit found that *Clanton* was implicitly overruled in *Becker v. Kroll*, 494 F.3d 904, 917-919 (10th Cir. 2007), but not for the reasons at issue in Applicant's case. *Becker* found that to the extent *Clanton* suggests a plaintiff may bring a Fourteenth Amendment claim in a 42 U.S.C. § 1983 action when an involuntary confession is used to arrest and imprison a plaintiff, the Fourth Amendment governs these claims. *Estate of Papadakos v. Norton*, 663 F. App'x 651, 657-58 (10th Cir. 2016).

involuntarily agreed to sign the medical form, and refused many times to sign the questionnaire.  *Id.* at 64-67.

On the same date that the victim filed the declaration, Applicant filed a pretrial motion *in limine* to exclude statements made in the course of medical diagnosis.  Case No. 03CR2296 Case File at 70-71.  In the motion, Applicant asserted that the victim stated to police and others that she did not wish to cooperate with the Applicant's prosecution and did not want the information she provided to the physician in the course of her treatment to be used by the prosecution.  *Id.* at 70. The trial court held a hearing to address this motion.  See Dec. 17, 2003 Mot. Hr'g Tr.

At the December 17 hearing, Robert Cory, an Aurora Police Department officer, who went to the hospital to talk to the victim, testified on direct examination that when he talked with the victim she had a difficult time talking because she could not open her mouth.  *Id.* at 18.  The officer further testified that the victim's left eye was almost swollen shut and black, but she appeared to answer the officer's questions honestly.  *Id.*  The officer also testified that in response to his question as to what happened the victim told him that (1) she picked up her ex-husband, Donald, after he was released from jail; (2) they went back to her apartment; and (3) there was a discussion about her being unfaithful, which resulted in Donald beating her with closed fists.  *Id.* at 19.  The officer further testified that he did not question the victim further, but he just let her talk, which she did for a couple of minutes.  *Id.* at 20.  The officer also stated that he was able to understand her, and the total time he talked with her the first time was five minutes, which was "bit-piece conversations because medical staff was coming and going in the victim's hospital room.  *Id.* at 21.

The officer further testified that he asked the victim to complete the domestic violence paperwork after she had a CAT scan, which he did by reading her the questions and circling the

response she gave.   *Id.* at 21-22.   The officer testified that the victim appeared to understand he was a police officer and why he was there, and she did not state at any time she did not wish to talk to him or wanted to be left alone.   *Id.* at 22.   The officer also testified that he did not tell the victim she should say "Donald hit her."   *Id.* at 23.   The officer stated that he did not tell her she had to answer the questions on the domestic violence questionnaire or threaten her if she did not answer she would be in trouble.   *Id.*   The officer further stated that he was dressed in full uniform when he talked with the victim, but he did not display his weapon, OC (pepper) spray, or any other weapon he had in his ankle holster to convince the victim to answer the questions.   *Id.* at 24-25. The officer also testified that the victim did not state (1) she desired not to answer the questions; (2) the officer's conduct was harassing; or (3) she wanted him to stop.   *Id.* at 25-26.   The officer further testified that (1) his tone was conversational; (2) he did not raise his voice when he talked with the victim at the hospital; and (3) he did not contact her after the time at the hospital or threaten her in any way that she needed to cooperate with the investigation.   *Id.* at 26-27.

On cross-examination, Officer Cory also stated that the victim was on an IV, which had been placed in her writing hand, but he did not know what was in the IV.   *Id.* at 29-30.   He further stated that the victim did not sign a medical release form in his presence, but he did have a notation about the signed form in his report.   *Id.* at 30-31.   Officer Cory further agreed that (1) the victim told him she was in pain; (2) she seemed coherent; (3) she did not have signs of intoxication; (4) she stated at some point she wanted to go to sleep, but she did not fall asleep; and (5) if she had slurred speech he would not have known because she did not move her jaw when she spoke.   *Id.* at 31-34.   Finally, Officer Cory testified that (1) it took thirty to forty-five minutes to complete the domestic violence questionnaire form; (2) the victim showed no other signs of emotional distress

besides the pain; and (3) because the victim was having difficulty with her hands he had determined she would not be able to sign the form. *Id.* at 36-38.

On redirect, Officer Cory confirmed the problem the victim had talking was mechanical and not due to comprehension or responsiveness. *Id.* at 39.

The trial court denied the motion to suppress the victim's statements to Officer Cory. Dec. 17, 2003 Mot. Hr'g Tr. at 68-69. The court acknowledged the affidavit that the victim provided, in which she claimed she was under drugs, was coerced, harassed, and otherwise caused to provide information, but the court gave the affidavit little weight because it was only an affidavit. *Id.* at 68. The court, based on the evidence presented by Officer Cory, found that (1) the victim had been at the hospital for about three hours when Officer Cory asked her what happened; (2) the victim gave logical answers to Officer Cory's questions, which were consistent with what she said to the attending physician; (3) there was a thirty-five to forty-five minute break between when Officer Cory first talked with the victim and when he finished a domestic violence questionnaire with her, by asking her questions and writing the answers on the questionnaire; (4) the victim answered the questions in the questionnaire logically and at no time stated that she felt harassed, intimidated, or threatened; (5) the victim's slowness of speech was not due to the drugs she may have been given for pain but was due to what had happened to her; and (6) because she responded to Officer Cory's questions some one to three hours after she initially arrived at the hospital she knew who the officers were and the nature of her answers. *Id.* at 70-71.

Finally, the Court notes that when the victim did not appear at trial to testify a warrant was issued for her arrest and she was jailed overnight. Jan. 13 Jury Trial Tr. at 6-8. The next day, the victim testified that while she was treated at the hospital the police and a detective spoke to her and she told them what had happened. Jan.14, 2004 Jury Trial Tr. at 23. She further acknowledged

her previous testimony at the preliminary hearing and that she had stated how she was medicated and did not remember talking about what happened. *Id.* at 27-28. She also stated that her testimony at trial was true and what she had said before was because she was afraid of Applicant. *Id.* at 28.

The Court must consider the totality of the circumstances. *Gonzales*, 164 F.3d at 1289. Also, pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct, and Applicant bears the burden of rebutting the presumption by clear and convincing evidence. Based on (1) the testimony provided by Officer Cory at the motion to exclude statements hearing; (2) the victim's failure to appear and testify at the hearing, without explanation, and to only provide a declaration that recants her testimony at the preliminary hearing; and (3) the subsequent testimony by the victim at trial that she did not state the truth previously because she was afraid of Applicant, the Court finds the victim's statements made to Officer Cory were voluntary and Applicant has failed to demonstrate clear and convincing evidence otherwise.

The Court, therefore, finds that the victim's will was not overborne and her capacity for self-determination was not critically impaired. *Id.* The victim was not coerced into making false statements and the trial court's denial of the Applicant's motion to exclude the statements did not implicate his due process rights. Claim Four is dismissed for lack of merit.

## B. Claim Ten/Use of Victim's Confidential Medical Information

In Claim Ten, Applicant asserts that his due process rights to a fair trial and equal protection rights were violated by the use of the victim's confidential medical information in violation of the victim's physician-patient privilege. ECF No. 1at 13. Applicant contends that

"[c]riminal convictions cannot be found upon the deliberate violation of other people's rights and privileges."  *Id.*

At the December 17, 2003 hearing, Hal Selden, an Aurora Police Department off-duty detective, testified.  *See* Dec. 17, 2003 Mot. Hr'g at 40-65.  Detective Selden was working off-duty at the Aurora Medical Center emergency room on July 29, 2003, when the victim was brought to the hospital in an ambulance.  *Id.* at 40-41.  Detective Selden stated that on off-duty he wears a police uniform and carries a sidearm and pepper spray.  *Id.* at 41.  He also stated that he assists patrol officers by staying with the victim of an assault and tries to assist the victim.  *Id.* at 41-42.  Detective Selden further testified that one of the victim's eyes was swollen shut, she had blood around her lips from bleeding from the mouth, and appeared to have trouble breathing and to be in pain.  *Id.* at 43.  Detective Selden also stated that the attending physician asked the victim what happened, and she provided an explanation to both him and the physician.  *Id.* at 44.  Detective Selden further stated that the victim knew he was a police officer, but she never asked him to leave while she explained to the physician what had happened.  *Id.*

Detective Selden testified the victim stated that (1) she had gone to pick up her boyfriend from the prison on Smith Road; (2) they went back to her apartment; (3) when they arrived at the apartment he began beating her because he knew she had cheated on him while he was in prison; and (4) she named her boyfriend as Donald Wallin.  *Id.* at 44-45.  Detective Selden stated that this interaction with the victim was a few minutes, but he came back later and asked for her consent to obtain her medical records.  *Id.* at 46.  He further testified that (1) he did not coerce or threaten her into complying with the investigation; (2) he did not display his weapons; and (3) the victim clearly appeared to be upset about being assaulted and seemed happy to give the information.  *Id.* at 46-47.  Detective Selden also testified that (1) he described the release form

to the victim, which allowed the police access to the medical records created by the physicians and nurses treating her; (2) he wrote the information on the form that the victim provided; (3) the victim was able to provide a partial signature on the release form, even though it was physically difficult for her to do so; and (4) though she appeared a little "punch drunk," and had difficulty talking, she was able to describe what happened, state who did it, provide Applicant's name and age, and give her address. *Id.* at 48-52. Finally, Detective Selden stated he had no contact with the victim after his involvement at the hospital. *Id.* at 53.

On cross-examination, Detective Selden testified that (1) he read the consent form to the victim, which is standard practice; (2) he told the victim that the release was for investigative purposes and so the police could access her medical records; and (3) when the victim asked where to sign the consent form he placed an "x" on the form where she needed to sign. *Id.* at 59, 62-63.

The trial court denied the motion to suppress (by virtue of a violation of the physician/patient privilege) the victim's consent for her records and the statements the victim made to the treating physician in Detective Selden's presence. *Id.* at 69-70. In support of the denial, the court found that (1) Detective Selden was in full uniform and told the victim he was from the police department; (2) he remained in the victim's private room while she consulted with the emergency room physician and the victim never asked Detective Selden to leave; (3) the court was aware that the victim was familiar with police and law enforcement based on her involvement in another case; (4) an hour after she told the physician what happened she signed the medical release forms so she knew what she had said to the physician and in front of the detective; (5) she signed her name in part on the consent form and saw the detective note she could not finish the signature; and (6) though she appeared lethargic and had some difficulty speaking this was only because she had been assaulted. *Id.* at 68-69.

The Court must consider the totality of the circumstances. *Gonzales*, 164 F.3d at 1289. Also, pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct, and Applicant bears the burden of rebutting the presumption by clear and convincing evidence. Based on (1) the testimony provided by Detective Selden at the motion to exclude statements hearing; (2) the victim's failure to testify at the hearing, without explanation, and to only provide a declaration that recants her testimony at the preliminary hearing; and (3) the subsequent testimony by the victim at trial that she did not state the truth previously because she was afraid of Applicant, the Court finds the victim voluntarily signed the medical release form, and made statements to the physician in front of Detective Selden, and Applicant has failed to demonstrate clear and convincing evidence otherwise.

The Court, therefore, finds that the victim's will was not overborne and her capacity for self-determination was not critically impaired. *Id.* The victim was not coerced into signing the medical release form and the trial court's denial of the Applicant's motion to exclude the medical records, and any statements made by the victim to the attending physician in front of Detective Selden, did not implicate Applicant's constitutional rights. Claim Ten is dismissed for lack of merit.

## C. Claim Eleven/Trial Court's Abuse of Subpoena Powers

In Claim Eleven, Applicant asserts that during the criminal proceedings the victim stated numerous times she was not a victim and did not want to participate in the proceedings. ECF No. 1 at 13. Applicant contends the Colorado Statutes and Rules of Criminal Procedure do not state that "a 'victim' can be subpoenaed," and the court's failure to hold a hearing regarding the victim's affidavits and declaration, which claimed oppression and a burden if she appeared, is abusive. *Id.* Applicant also asserts that the abuse of the subpoena caused a violation of his rights. *Id.*

In the Reply, Applicant argues that the victim was falsely arrested under the enforcement of an improper subpoena, forced to testify in court with a 50,000 volt stun mechanism on her leg, and told to testify to what the police had stated happened or she would be stunned.   ECF No. 61 at 2-3.

Applicant's claims are self-serving.   The record does not support Applicant's claim that the victim was unwilling to testify for reasons other than she was afraid of Applicant.   January 14, 2004 Jury Trial Tr. at 28.   Furthermore, as part of the court record, a discussion was held between the prosecution, defense, counsel for the victim, and the trial court regarding the victim's testimony.   *Id.* at 8.   During this discussion, the victim's counsel stated she understood that the victim was granted "use immunity" as to any type of prejudice or false reporting to police officers based on her statement.   *Id.*

Nor does the trial record support Applicant's claim that the victim was not personally served.   *See* Jan. 12, 2004 Pretrial Hr'g at 5.   To the contrary, the record shows specifically that the prosecution stated to the court "Ms. Icis McCray was personally served, as the court can see, to be here at 8:30 this morning."   *Id.*   Furthermore, even if a state violates its own law, it is not sufficient, *per se*, to state a federal constitutional violation.   *See Davis v. Scherer*, 468 U.S. 183, 194-96 (1984); *Rector v. City & County of Denver*, 348 F.3d 935, 947 (10th Cir. 2003).

Also, the record does not support Applicant's claim that the victim was forced to wear a stun mechanism and if she did not testify to what the police had stated she would be stunned.

The Court finds that nothing Applicant asserts regarding the prosecution's subpoena of the victim implicates a violation of his constitutional rights.   Claim Eleven, therefore, will be dismissed as meritless.

## IV.   CONCLUSION

In summary, the Court finds that Applicant is not entitled to relief on Claims Four, Ten, and Eleven.   Accordingly, it is

**ORDERED** that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, ECF No. 1, is denied and this case is dismissed with prejudice.   It is further

**ORDERED** that there is no basis to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c).   It is

**ORDERED** that leave to proceed in forma pauperis on appeal is denied.   The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith.   *See Coppedge v. United States*, 369 U.S. 438 (1962).   If Applicant files a notice of appeal he must also pay the full $505 appellate filing fee or file a motion to proceed in forma pauperis in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

DATED this 14th day of April, 2017.

**BY THE COURT:**

_____
Marcia S. Krieger
United States District Court